# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

CIVIL NO. 3:02-CV-101-W

| | |
|---|---|
| GRECON DIMTER, INC., ) | |
| ) | |
| Plaintiff/Counter-Defendant, ) | |
| ) | |
| vs. ) | ORDER |
| ) | |
| HORNER FLOORING CO., INC., ) | |
| ) | |
| Defendant/Counter-Plaintiff. ) | |
| ) | |

THIS MATTER comes now before the Court for decision on plaintiff's motion for summary judgment (Doc. No. 91), following a motions hearing held 28 September 2006. Also before the court is defendant's motion for leave to file a supplemental memorandum in opposition to summary judgment (Doc. No. 126), which is summarily denied since the Court does not reach the issues proposed to be briefed.

## BACKGROUND

Plaintiff and counter-defendant GreCon Dimter, Inc. (hereinafter "GreCon") is a North Carolina corporation with its principal place of business in Hickory, North Carolina. GreCon is a wholly-owned subsidiary of a German conglomerate, the Weinig Group, which is a worldwide supplier of commercial saws and woodworking machinery. Defendant and counter-plaintiff Horner Flooring Co., Inc. (hereinafter "Horner") is a Michigan corporation located in Dollar Bay, Michigan, which manufactures hardwood flooring primarily for gymnasiums and basketball courts.

This case arises out of a contract for the sale of several components of an automated rough line sawmill (hereinafter "Mill System") that Horner purchased from GreCon in 1999, which has

failed to live up to Horner's expectations. After two years of negotiations in an attempt to work out the glitches, GreCon filed suit in the Mecklenburg County Superior Court to collect an unpaid balance on the contract of approximately $28,000. Horner removed the case to this court on the basis of diversity of citizenship, and filed counterclaims for breach of warranty and breach of contract. GreCon moved to dismiss the counterclaims on the basis that the written contract contained a German forum selection and choice-of-law clause. This Court denied the motion to dismiss, finding that GreCon had waived the benefit of the forum selection clause by filing its collection lawsuit in the North Carolina state court, but in a subsequent ruling found that GreCon had not waived the choice-of-law provision and, therefore, that German law would govern. The Court granted Horner's petition for interlocutory appeal of this decision, which ultimately was affirmed by the Fourth Circuit in an unpublished opinion. Discovery is now complete and, after an unfortunate but unavoidable delay caused by reassignment of Judges, GreCon's motion for summary judgment is ripe for adjudication.

ANALYSIS

A.  Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In making its determination, the Court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. Bailey v. Blue Cross & Blue Shield of Virginia, 67 F.3d 53, 56 (4th Cir. 1995). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and

2

identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)).  A mere "scintilla" of evidence is insufficient to create a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

B.  Timeliness of Suit

GreCon first argues that Horner's counterclaims are time-barred under the six-month "period of prescription"[1] imposed by German law.  GreCon's argument succeeds only if German law determines the limitation period and the counterclaims are in fact time-barred under German law.  Horner disputes both of these conclusions.

Under the choice-of-law rules codified in the German Civil Code (*Bürgerliches Gesetzbuch*, hereinafter "BGB"), it is the law of the contract which also determines the applicable statute of limitation.  (Schubert Aff. ¶ 12.)  However, pursuant to the principles enunciated in Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), a federal court sitting in diversity applies the substantive law of the state in which it sits, including principally the forum state's choice-of-law rules.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941).  Thus, contrary to analysis propounded in GreCon's brief, German choice-of-law principles are irrelevant to the determination of which sovereign's law applies.

Resolution of the conflicts of law question therefore turns on what effect a North Carolina court would give the choice-of-law clause contained in the parties' agreement, which provides that

---

[1] The "period of prescription" is akin to a statute of limitation under United States law.

3

the contract is to be "governed by and construed under the laws of Germany to the exclusion of all other laws of any other state or country (without regard to the principles of conflicts of laws)." (GreCon's Exs. 4 & 5, ¶ 9.) As this Court has already determined (and the Fourth Circuit has affirmed on interlocutory appeal), North Carolina courts would be guided by the UCC's choice-of-law provision, codified at N.C. Gen. Stat. § 25-1-105(1), and would give effect to the parties' agreement by applying German law to all substantive legal matters. However, North Carolina applies its own law in matters of procedure, and the Supreme Court of North Carolina has held that statutes of limitation are "clearly procedural" because they do not affect the substantive right to bring a cause of action but only affect the availability of a remedy in the forum's courts. Boudreau v. Baughman, 368 S.E.2d 849, 857 (N.C. 1988).

There is apparently no reported North Carolina case specifically holding that North Carolina's statute of limitation should be applied (to the exclusion of a foreign state's statute of limitation) in circumstances where, as here, the parties explicitly contracted for application of the foreign state's law in all matters pertaining to the contract. A growing minority of jurisdictions are adopting the more progressive view of the American Law Institute, which, like the law of Germany, would apply the limitation period of the law denominated by the parties in the contract notwithstanding the historic treatment of statutes of limitation as a procedural matter. See, e.g., Restatement (Second) of Conflict of Laws §§ 142, 187 (1971 & 1988 rev.); Hambrecht & Quist Venture Partners v. American Medical Int'l, Inc., 46 Cal. Rptr. 2d 33, 39-40 (Cal. Ct. App. 1995); Sears, Roebuck & Co. v. Enco Assoc., 370 N.Y.2d 338, 348-49 (N.Y. Sup. Ct. 1975). Although the North Carolina courts have not confronted this question directly, there is no evidence that North Carolina is moving toward the Restatement view, and federal decisions at both the district and circuit

level have consistently adhered to the established dogma even in cases involving contractual choice-of-law clauses. See RMS Technology, Inc. v. TDY Industries, Inc., 64 Fed. Appx. 853, 857 (4th Cir. Feb. 6, 2003); MedCap Corp. v. Betsy Johnson Health Care Sys., Inc., 16 Fed. Appx. 180, 182 & n.2 (4th Cir. Aug. 6, 2001); Rich Food Services, Inc. v. Rich Plan Corp., 2001 U.S. Dist. LEXIS 25955, at *10-*12 (E.D.N.C. Nov. 20, 2001). Thus, while clearly at odds with the intent of the parties as expressed in the terms of the contact, the Court declines to deviate from the weight of authority in this state and circuit and holds that North Carolina's statute of limitation governs this action.

GreCon attempts to salvage its untimeliness argument by insisting that the German period of prescription is more directly analogous to a statute of repose, which is a term "used to distinguish ordinary statutes of limitation from those that begin to run at a time unrelated to the traditional accrual of the cause of action." Boudreau, 368 S.E.2d at 856. Compliance with the time limitation established by a statute of repose is considered to be a "condition precedent" to the right to bring the claim, and in such cases the limitation period is "so tied up with the underlying right that for choice of law purposes, the limitation clause is treated as a substantive rule of law." Id. at 857 (citation and internal quotations omitted).[2] In other words, North Carolina would look to its own law for the applicable statute of limitation but would look to the substantive body of law out of which the cause of action arises for the applicable statute of repose. See generally id. at 856-57.

The German statute at issue, BGB § 477, ¶ 1, translates as follows: "The claim for

---

[2] GreCon also contends that the period of prescription is considered to be a substantive aspect of German law (Schubert Supp. Aff. ¶ 17), and implicitly argues that this alone should be sufficient to require its application under the Boudreau v. Baughman conflicts of law analysis. However, Boudreau clearly holds that the distinction between what is substantive and what is procedural for choice of law purposes is a matter governed by North Carolina law, see 368 S.E.2d at 856, so here again the German rule is irrelevant.

5

cancellation, reduction of the purchase price or compensation for non-performance becomes statute-barred six months after delivery . . . unless the seller has fraudulently concealed a defect." (Schubert Aff. ¶ 12.) GreCon argues that because the limitation period is measured from the date of delivery, it must be considered a statute of repose. As North Carolina courts have recognized, statutes of repose create time limitations which are not measured from the date of injury or related to the accrual of a cause of action. Trustees of Rowan Technical College v. J. Hyatt Hammond Assoc., Inc., 328 S.E.2d 274, 276-77 n.3 (N.C. 1985); Boudreau, 368 S.E.2d at 856; see also Black's Law Dictionary (8th ed. 2004) (defining "statute of repose" as "barring any suit that is brought after a specified time since the defendant acted (such as by designing or manufacturing a product), even if this period ends before the plaintiff has suffered a resulting injury."). By contrast, statutes of limitation "are generally seen as running from the time of injury" and "serve to limit the time within which an action may be commenced after the cause of action has accrued." Trustees of Rowan, 328 S.E.2d at 276-77 n.3.

GreCon's argument, however, neglects to consider that a claim for breach of warranty, by definition, accrues at the time of delivery of nonconforming goods. N.C. Gen. Stat. § 25-2-725(2). Thus, BGB § 477, ¶ 1, much like the four-year statute of limitation adopted by the UCC, does not in fact define the limitation period by reference to an event other than the breach at the time of defective performance and corresponding accrual of the claim.[3] Moreover, BGB § 477, ¶ 1, lacks other fundamental characteristics typically associated with statutes of repose. For example, because compliance with a statute of repose is a condition precedent to stating a claim for relief, it is the

---

[3] A breach of warranty should be distinguished from a products liability claim in tort, in which case the claim accrues at the time of personal injury. In the latter instance, statutes establishing a time limitation running from the date of manufacture or sale of the defective product have been consistently treated as statutes of repose. Boudreau, 368 S.E.2d at 856-57.

6

plaintiff's burden to plead and prove satisfaction of the statute. Tipton & Young Construction Co. v. Blue Ridge Structure Co., 446 S.E.2d 603, 605 (N.C. Ct. App. 1994). By contrast, a statute of limitation provides an affirmative defense which can be waived through failure to plead and must ultimately be proved by the defendant. Fed. R. Civ. P. 8(c); N.C. Gen. Stat. § 1A-1, Rule 8(c). Likewise, under German law, it is the defendant's burden to prove the expiration of the statutory period of prescription. (Schubert Aff. ¶ 12; Lorenz Aff. ¶ 2.) Finally, the purpose of a statute of repose is to create an "outer [time] limit" and serve as an "*unyielding and absolute barrier* that prevents a plaintiff's right of action even before his cause of action may accrue," Black v. Littlejohn, 325 S.E.2d 469, 475 (N.C. 1985) (emphasis added), whereas the German period of prescription, like a statute of limitation, is subject to liberal tolling in circumstances where justice so requires. (Schubert Aff. ¶ 12; Lorenz Aff. ¶ 2.)

Accordingly, the Court finds the German period of prescription set forth in BGB § 477, ¶ 1, inapplicable to Horner's counterclaims. Because it is undisputed that the counterclaims were filed well within North Carolina's four-year statute of limitation for breach of warranty, see N.C. Gen. Stat. § 25-2-725,[4] the asserted ground of untimeliness set forth by GreCon as a basis for summary judgment is hereby overruled.

C.     Breach of Warranty Claims

The essence of Horner's claims under German law is that GreCon expressly warranted that the Mill System would be capable of processing boards of a specific size (between 4 feet and 16 feet

---

[4] It appears to be Horner's position that the contract was primarily one for work (i.e., design and installation of the Mill System) and not primarily one for the sale of goods (i.e., the saws and other components of the Mill System). The Court applies the UCC's statute of limitation in this case because this Court (as affirmed by the Fourth Circuit) implicitly found the contract to be governed by the UCC when it applied § 1-105 in making its choice-of-law determination. Nonetheless, Horner's counterclaims would be timely even applying North Carolina's three-year statute of limitation for contracts other than for the sale of goods. N.C. Gen. Stat. § 1-52(1).

7

6 inches) and at a specific rate (250 linear feet per minute) given specific staffing requirements. (3d Am. Counterclaim ¶¶ 12-14.) GreCon argues that it is entitled to summary judgment because Horner cannot as a matter of law establish that any such warranties became part of the contract concluded between the parties.

Horner asserts that the alleged warranties, albeit not contained in the written memorialization of the agreement, were communicated at various points throughout the parties' negotiations. Viewed in the light most favorable to Horner, the facts supporting this contention are as follows: In 1998, Horner solicited bids from various manufacturers, including GreCon, for its new Mill System. Horner's bid packet consisted of a price quotation for 38 pieces of equipment, a draft contract, and equipment specifications including the size lumber that could be handled (minimum 4 feet, maximum 17 feet 6 inches) and an estimated production throughput of 400 feet per minute. (Horner's Ex. 5.)

While engaged in negotiations with GreCon, Horner commenced work on its "Performa" [sic], a financial analysis evaluating the return on its potential investment in a new Mill System. (Horner's Ex. 12.) These projections relied upon certain critical assumptions as to labor and material costs and anticipated production and waste (id.), and Horner Vice President Mark Young in turn relied upon data and other representations provided by GreCon in the course of the negotiations in forming these assumptions (Young Aff. ¶ 14). For example, GreCon represented the number of employees necessary to operate the new equipment both on schematic drawings (id. ¶ 16) and orally through its agent, Dan Forrest (Mott Aff. ¶ 11).

Upon completion of the "Performa" [sic], Horner ascertained that the new Mill System would have to be capable of a throughput of 250 linear feet per minute in order to remain competitive and

8

profitable in the industry. (Young Aff. ¶ 17.) Horner communicated this information, as well as information about the general dimensions and quality of its lumber, to GreCon. (Young Aff. ¶¶ 19, 21; Hamar Aff. ¶ 3; Mott Aff. ¶¶ 3-5.) Ken Mott and Dan Forrest, both agents of GreCon, consistently indicated that GreCon's equipment could accommodate the dimensions and quality of Horner's lumber and meet or exceed Horner's minimum throughput requirements. (Young Aff. ¶ 23; Hamar Aff. ¶ 5; Mott Aff. ¶ 6.)

Horner paid GreCon a $20,000 non-refundable deposit for the new Mill System in May 1998. (Young Aff. ¶ 12.) On 22 September 1998, following extensive negotiations, representative from both parties held a "Kick-Off Meeting" at Horner's facility in Michigan. Much of the Kick-Off Meeting was spent discussing the layout drawings, how the production was going to flow, the manpower required for that process, and the Mill System's technical specifications. (Young Aff. ¶ 28.) These topics are reflected in the written notes provided for the Kick-Off Meeting, which evidence the parties' understanding as to the type of lumber to be handled by the System as well as the production objective of 250 linear feet per minute. (Horner's Ex. 14.) Also contained within the notes are proposed design drawings depicting employees at each station where, according to GreCon, one employee would be required. (Id.; Hopper Depo. at 184-92; Dunstan Aff. ¶ 3.)

Following the Kick-Off Meeting, in October 1998, the parties formally executed two purchase order contracts for the Mill System valued at more than $1.4 million. The contracts list the component parts of the Mill System to be delivered, set a payment schedule, and provide that installation and start-up is included in the contract price. (Horner's Ex. 16.) The contracts provide for a warranty of one year for any component which fails due to poor workmanship or inferior material, but are silent as to any warranty regarding the production capacity of the Mill System as

9

a whole. (Id.) Finally, the contracts provide that the equipment is ordered pursuant to GreCon's General Terms of Delivery, a document which makes its appearance in the record for the first time as a fine-print attachment to GreCon's offer letters. (Id.)

    The General Terms of Delivery provide, in relevant part, that:

> All orders as well as any supplementary or deviating agreements are only valid if in writing.
>
> The extent of the delivery and the performances is determined by our offer. . . .
>
> Details about dimensions and weights, performance data, illustrations and drawings are only approximately applicable for the buyer and ourselves. They only become binding following our explicit written confirmation and within normal tolerances.

(Id.) The General Terms of Delivery also contain a "Guarantee and liability" paragraph which appears to have been superseded in substantial part by the express warranty contained in the written offer.[5] However, this paragraph contains two limitation of liability provisions which are specifically at issue in this case:

> In the event of . . . defects due to incorrect instructions by the buyer, for example regarding design, raw materials or accessories, . . . we are released from all liability. . . .
>
> There shall be no liability for defect damages based on positive violation of claims of precontractual, contractual or legal individual or joint liability or of a non-contractual nature, unless the seller or his contractual associates are charged with malice aforethought or gross negligence.

(Id.)

    Under German law applicable to this case, "[t]he seller of a thing warrants the purchaser that,

---

[5] For example, the contract provides for a one-year warranty whereas the General Terms provide for only a three-month warranty.

10

at the time when the risk passes to the purchaser, it is free from defects which diminish or destroy its value or suitability for its ordinary use, or the use provided for in the contract. . . . The seller also warrants that, at the time the risk passes, the thing has the promised qualities." BGB § 459 (Schubert Aff. ¶ 8(i)); see also BGB § 633 (Schubert Aff. ¶ 9). As under local law, a warranty may "result[] from the known purpose for which the delivered goods are to be used" and can arise where "the customer has placed particular emphasis on a particular feature and [] the contractor confirmed the presence of such feature in the work or good." (von Wallwitz Aff. ¶¶ 10, 11); accord N.C. Gen. Stat. §§ 25-2-313, -315.

For the purposes of this motion, GreCon does not seriously dispute the substance of the parties' precontractual negotiations; therefore, the central issue presented here is whether GreCon's representations were affirmations of fact which became integrated into the parties' agreement notwithstanding the limiting language contained in the General Terms of Delivery. As to this issue, Horner argues that under the German Act on General Terms and Conditions ("AGBG"), "individual agreements take precedence over general terms and conditions" and may not foil or nullify the substance of the negotiated terms. (von Wallwitz Aff. ¶ 14; Lorenz Aff. ¶ 3.) According to Horner's Rule 44.1 foreign law expert, this result obtains even if the warranties are based on oral representations made in the course of pre-contractual negotiations. (Id.) In rebuttal, GreCon relies on the affidavit of its foreign law expert in support of the position that an agreement requiring all contractual terms to be in writing (what in the American legal lexicon might be known as a "merger" or "integration" clause) is valid and enforceable notwithstanding the cited provisions of the AGBG. (Schubert Supp. Aff. ¶¶ 4, 7.)

While the material facts are largely undisputed with respect to the parol agreement issue (at

11

least for purposes of this motion), the parties' Rule 44.1 experts (not surprisingly) differ in their interpretation of relevant German law. A determination of foreign law under Rule 44.1 is, of course, a question of law, a dispute over which would not preclude decision on summary judgment. Kashfi v. Phibro-Salomon, Inc., 628 F. Supp. 727, 737 (S.D.N.Y. 1986). In the circumstances, however, where trial of this matter is to be by the Court and not a jury, the Court will withhold final determination on the disputed foreign law issues until trial of this matter, where the parties' foreign law experts will be able to state their conclusions subject to examination and based upon the particular facts established in evidence.

If the Court were required to make a determination of foreign law on the present record, however, the following considerations would preclude a finding in favor of GreCon, because as the movant it carries the burden of persuasion. First, GreCon's foreign law expert stakes his conclusions on a statute in the BGB which has no apparent application to the case at bar,[6] and a decision of the German Federal Supreme Civil Court which is distinguishable on its facts.[7] Second, while the Court recognizes a significant public policy in favor of integrated written agreements, which doubtlessly manifests itself in some form in German law (Schubert Aff. ¶ 4), the Court is also cognizant that other important policy interests preclude the parol evidence rule from being an absolute and unyielding shield. See generally 1 B. Clark & C. Smith, The Law of Product Warranties §§ 4:27-4:32 (2006). While it appears likely that the parol evidence rule would, in this case, foreclose

---

[6] GreCon's foreign law expert cites to BGB §§ 126-27, which appears to be a rough analog to our statute of frauds, not the parol evidence rule. However, this case does not raise any statute of frauds issues, since there is a signed writing containing all the essential terms (e.g., price, quantity) of the transaction.

[7] The case cited by GreCon appears to deal with a situation where a *post*-contractual oral modification was ineffective against a contract term requiring all modifications to be in writing, not the situation where *pre*-contractual oral terms are used in an attempt to supplement a subsequently integrated writing.

Horner's counterclaims if governed by the UCC, see Agri-Tech, Inc. v. Brewster Heights Packing, Inc., 1993 WL 398486 (4th Cir. 1993), the UCC is not the law of Germany and this Court must be guided by the particular policy choices that the Federal Republic of Germany has made.[8] It is incredible to think that this is an issue of first impression in Germany, yet the parties' Rule 44.1 affidavits unhelpfully advocate generally applicable, bright-line rules with little effort to tailor their analyses to the particular facts and equities of this case, thus precluding summary judgment on the present record.

Third, even under the construction of German law advocated by GreCon, parties may waive the writing requirement and bind themselves to oral terms.[9] (Schubert Aff. ¶¶ 8, 9.) In this case, Horner has presented evidence that GreCon worked for more than two years following delivery of the Mill System to remedy perceived defects and specifically to boost production capacity to the desired 250 linear feet per minute. (Horner's Exs. 27-29, 31-34, 36, 42-44, 47; GreCon's Exs. 31, 37.) While perhaps not conclusive that express warranties were intended by the parties notwithstanding the contractual language (it may be explained as simply good business practice), the parties' course of performance is at least probative of that conclusion, entitling Horner to a trial on these claims.[10] Finally, even if GreCon is correct that the oral warranties were not incorporated into

---

[8] The parol evidence rule is not a rule of evidence but rather a substantive rule of contract law, see Ace, Inc. v. Maynard, 423 S.E.2d 504, 508-09 (N.C. Ct. App. 1992), and so, under the choice-of-law analysis set forth above, GreCon prevails only if German law would preclude integration of pre-contractual representations into the parties' agreement.

[9] This is consistent with local practice under the UCC, which excepts from the operation of the parol evidence rule the parties' course of performance under the contract. See N.C. Gen. Stat. §§ 25-2-202(a), -316(3)(c); cf. Bone Int'l, Inc. v. Johnson, 329 S.E.2d 714 (N.C. Ct. App. 1985).

[10] Accord Sierra Diesel Injection Service v. Burroughs Corp., 651 F. Supp. 1371, 1377 (D. Nev. 1987) (finding that pre-contractual oral promises coupled with post-contractual efforts to remedy created a triable issue as to whether the parties' written agreement was fully integrated as to the warranty term).

the parties' agreement, GreCon does not dispute that the contract carries with it an implied warranty of fitness for ordinary use, see BGB §§ 459, 633, a claim upon which Horner is independently entitled to a trial.[11]

D.      Release from Liability Clause

GreCon next argues that even if the Mill System is not performing as warranted, it should be released from liability under the contractual provision providing that "[i]n the event of . . . defects due to incorrect instructions by the buyer, for example regarding design, raw materials or accessories, . . . we are released from all liability." (Horner's Ex. 16.) Under applicable German law, GreCon must prove that Horner provided incorrect instructions, which shifts the burden to Horner to demonstrate that the incorrect instructions did not cause the breach. (von Wallwitz Aff. ¶ 16.) According to GreCon, Horner provided inaccurate information concerning the size and dimensions of the lumber that was to be processed by the Mill System. Because it necessarily takes a greater number of cuts to process shorter boards, GreCon argues that an overstatement by Horner of the average length of its boards would result in a slower throughput than reasonably estimated by GreCon. (GreCon's Ex. 29.) While this certainly seems to be a reasonable premise, GreCon has not demonstrated an absence of material fact on the question of whether Horner in fact provided inaccurate information,[12] and so summary judgment on this basis is precluded.

---

[11] As an alternative basis for summary judgment, GreCon argues that there is no genuine dispute of material fact as to whether the Mill System breached any warranty. GreCon's arguments on this point hardly merit discussion: the fact that production at the mill has increased over time has absolutely no bearing on whether the Mill System is fit for its stipulated purpose or even its ordinary purpose, as actual production capacity and efficiency might improve while nevertheless falling short of the levels promised in the contract or considered acceptable in the industry today (the mill Horner replaced, after all, dated back to the 1930's).

[12] For example, the Court fails to see a material inconsistency in the Kick-Off meeting notes (which state that "[Horner's] lumber lengths vary from 4' to 16'-6". The percentage breakdown by length would be 70-80% 8' with the balance of the material being 10' and longer. The percentage of 4' is very small in comparison but we do run 4'-6'

(continued...)

E.   *Positive Vertragsverletzung* (Positive Breach of Contract) Claim

GreCon finally argues that it is entitled to summary judgment on count three of Horner's Counterclaims for positive breach of contract. Under German law, a claim for positive breach of contract (*positive Vertragsverletzung*) can be maintained to recover damages beyond mere expectation damages (such as consequential damages), provided that the plaintiff can prove fault (i.e., a negligent or intentional act or omission) in the defendant's performance of its contractual duties. (von Wallwitz Aff. ¶ 32.)

GreCon's General Terms of Delivery limit its liability for positive breach of contract as follows: "There shall be no liability for defect damages based on positive violation of claims of precontractual, contractual or legal individual or joint liability or of a non-contractual nature, unless the seller or his contractual associates are charged with malice aforethought or gross negligence." (Horner's Ex. 16.) Limitation of liability provisions such as this are valid under German law unless they "unreasonably disadvantage the contractual partner . . . contrary to the requirements of good faith." AGBG § 9, ¶ 1 (von Wallwitz Aff. ¶ 19). Horner's foreign law expert admits that this provision is "not objectionable in principle since it excludes cases of malice and gross negligence." (von Wallwitz Aff. ¶ 30.) Furthermore, the Court cannot conceive how such a limitation of liability, so commonplace in commercial transactions, could rise to the level of bad faith or

---

[12](...continued)
pieces.") (GreCon's Ex. 36), the letter to Chris Aiken (which states that "[Horner's] lumber is nearly 80% 8' and shorter.") (GreCon's Ex. 43), and Mark Young's deposition testimony (which allegedly states that 4% of the lumber processed was 4' long and 5% of its lumber is 16' long, although the referenced deposition pages were not provided to the Court). In each scenario, the bulk of the lumber is estimated to be eight feet in length with the number of shorter boards represented as being "very small in comparison" at around four percent.

unconscionability[13] as between two sophisticated business entities.[14]

Pursuant to Fed. R. Civ. P. 56(e), it is Horner's burden to come forth with specific facts demonstrating a genuine issue of material fact. Horner has failed to point to any evidence indicating that GreCon acted with malice or gross negligence in its performance of contractual duties, as required under the valid limitation of liability clause, and so summary judgment in favor of GreCon is proper on Horner's positive breach of contract claim.

F.  GreCon's Collection Claim

A final issue is whether GreCon is entitled to summary judgment in the amounts of $27,955.58 (the unpaid balance of the contract price) and $15,614.22 (the balance due on additional parts ordered) on its collection claim. Horner does not dispute that these balances remain outstanding, but asserts the defenses of breach of the contract and a right of setoff. The contract specifically provides that "[c]ompensation shall not be settled with disputed counterclaims of the buyer" (Horner's Ex. 16), thus ostensibly foreclosing Horner's right to setoff. However, neither party has discussed whether a material breach of the contract by GreCon, as alleged by Horner, would effectively rescind the contract or otherwise release Horner of its payment obligation under applicable German law. Thus, out of an abundance of caution, the Court will withhold granting summary judgment on Horner's claim pending final disposition of the surviving counterclaims.

---

[13]According to GreCon German law expert Jan-Friedemann Schubert, the German legal principle that "a contract may not 'unreasonably discriminate' against one party [] is similar to the American legal concept of 'unconscionability.'" (Schubert Supp. Aff. ¶ 13.)

[14] Horner cites German case law suggesting that the liability limitation clause is invalid in its entirety because it does not make an exception for failure to fulfill "cardinal obligations." (von Wallwitz Aff. ¶ 31.) However, the cases cited are readily distinguishable as they deal only with limitations of liability that have been deemed unconscionable in the context of consumer transactions. (Schubert Supp. Aff. ¶ 14.)

CONCLUSION

In consideration of the foregoing, defendant's motion for leave to file a supplemental memorandum in opposition to summary judgment (Doc. No. 126) is DENIED, and plaintiff's motion for summary judgment (Doc. No. 91) is GRANTED IN PART and DENIED IN PART. Count three of Horner's third amended counterclaims is hereby DISMISSED, and this matter shall proceed to trial on the allegations set forth in GreCon's complaint and counts one and two of Horner's third amended counterclaims. The clerk is DIRECTED to schedule this matter for final pre-trial conference at 3:00 p.m. on 22 December 2006, and for bench trial during the Court's civil term beginning 22 January 2007.

IT IS SO ORDERED.

Signed: October 18, 2006

Frank D. Whitney
United States District Judge